Be seated please. Third case of the morning is number 2240383 Treadway v. Otero and we will hear first from Ms. Barletta. Good morning and may it please the court. My name is Natalie Barletta and I, along with Susan Clothier, represent the appellants in this case, the Oteros and Excess Foods, Inc. The crux of the issue before this court is whether Ms. Treadway, the plaintiff appellee, was forced to provide labor to the appellants in this case. Forced labor is a predicate requirement to all of the appellee's claims under the Trafficking Victim Protection Act, or the TVPA, and also requires a knowing intent on the part of the defendants to traffic the person here for the purpose of obtaining labor from the plaintiff, which she would otherwise not have willingly provided. The record reflects no evidence that the Oteros intentionally trafficked the plaintiff, a family member, to the U.S. to force her into involuntary servitude. If we look at Section 1581, the Peonage Statute, the Supreme Court in Client v. U.S. describes peonage as a state of compulsory service or involuntary servitude. Every single element of the plaintiff's claim requires two simple things, knowing, knowledge, and intent on the part of the defendant to have brought her here for the purpose of keeping her in a forced labor state, and the actual forced labor element. Involuntary servitude is defined by this court in Watson v. Graves as an action by the master causing the servant to have or to believe she has no way to avoid continued service or confinement. When the employee has a choice, this is from this court, I quote, even though it is a painful one, there is no involuntary servitude. All of the evidence that police cite in their brief, none of the evidence that police cite in their brief, creates the causal link between a threat, abusive law, abusive legal process, and an alleged situation of peonage or forced labor in this case. The Trafficking Victims Protection Act was meant to be used as a shield, a shield to protect victims who are in deplorable circumstances, a shield to protect those who have been intentionally brought here for some nefarious purpose. That is not the way it is being used in this case. The plaintiff's claims in this case amount to complaints about wages and hours. Are you saying this that as a matter of law your client should have prevailed? Yes, Your Honor. In the district court, did you ever move for summary judgment or you moved for 50B relief? And I don't think we, do we have anything in the record as to why, exactly why the court denied judgment as a matter of law? Your Honor, the court, the defendants did move for directed verdict at the close of the plaintiff's case, specifically citing each element of the charge, each element of the plaintiff's claims and saying that there was, and went over in detail, a defense counsel went over in detail the elements of plaintiff's claims and why the plaintiff's evidence did not suffice, was insufficient legally to continue to the jury. And then we re-urged that motion at the end of trial in the form of a J&OB at the court. But we don't really have much of an opinion from the court on that, do we? No, Your Honor, we do not. It was a jury verdict. Okay. In this case, if the plaintiff is allowed to go forward with the human trafficking claims in this manner, it creates the precedent that this may be used as a sword to attack a small family business. In this case, the Oteros brought their own family members over here. They came voluntarily from Cambodia. They knew they would be working in a donut shop. They had endless freedom when they got here in the United States. This just seems very factual to me. It seems like y'all are saying she stole money and la, la, la. But she did not get convicted of that. And she has a very different view. And y'all are saying, we just helped her. We were so gracious. We brought her in. And she has a very different view of what you all did. And isn't the factual determinations what jurors are for? You know, you sound, boy, what you're saying, that sounds fine. What she's saying, very different. And isn't that what juries decide? You're right that the jurors do decide credibility in facts. But in this case, there is absolutely no evidence to support that the defendants knowingly trafficked her here or held her in a condition of forced labor. And so that's different. We're not asking you to evaluate the facts or the credibility of the witnesses below. We are asking you to recognize that there is no legally sufficient evidence. There was no abuse of law or legal process, no threat of serious harm. The U.S. versus tour case, which we cited in our brief, defined serious harm not just as physical harm, but it could be psychological harm also. But it has to be of such a serious nature that a reasonable person would see no other alternative, for example. And in this case, she had endless alternatives. She met her boyfriend in 2012. She married him in 2015. Got a green card in 2016. Even went back to Cambodia at that time with all of the family, celebrated. Was she forced to delay that marriage? Is that in the record as well? She says that she was unable to get married for three years. But, again, that is not a threat. There's no abuse of law or legal process. It doesn't fit the statute. So even assuming her allegation is true, that abuse of law is not required in 1589. There are three grounds. One is by means of force, threats of force. Yes. Another one is by means of abuse or threatened abuse. But these are in the alternative. They're not conjunctive. Yes, Your Honor. And none of those apply. There is no threat of force or physical force anywhere in the record or of physical restraint. There is no threat of serious harm to that person or another person. The fact that she was limited in seeing the boyfriend and that she was allegedly working 15, 16, 18 hours a day isn't forced? No, Your Honor. There are lots of complaints about hours and time, the working conditions, so to speak. But those claims may better be brought under a Fair Labor Standards Act claim. And we don't want to turn every Fair Labor Standards Act claim into a human trafficking claim. They have very different purposes. And there's scant case law in the civil context regarding these issues. But if you look at the Fourth Circuit's opinion in Muchara, it is directly on point, and it does have a detailed analysis of just these issues. And if you look at the plaintiff in that case, the facts are almost identical to those that we have before us here. She had freedom to travel, freedom to go. In this case, the plaintiff had her own apartment, had keys to the apartment, had a moped, had a phone, had a Facebook page, had access to the outside world. There was absolutely no circumstance where she believed that she was forced to remain here. And, in fact, nothing in the record indicates that any of these four alternatives. What about paying off a $20,000 debt? Yes, Your Honor. She did testify, and assuming that she said that, there was still no threat of serious harm. So there's nothing in the record to indicate that either one ever paid anything back. The aunt actually left in 2014, a full year earlier. So if we're assuming that that is true, there was no threat of serious harm, no threat of abuse of law or legal process. There was no scheme, plan, or pattern to cause her to believe that serious harm would occur to her or to someone else that she cared about. So there's absolutely no evidence to support any of the alternatives. So what did the jury find against you all? That's a good question, Your Honor. There was evidence from the plaintiff, but jurors often don't understand the law. They don't understand that you can't just feel bad for a person. You can't feel bad for a plaintiff in poor working conditions. Actually, while I was a state district judge, I felt like jurors did try very hard to follow the rules that I gave them and follow the law. I'm not saying I necessarily would have come out the same way as every juror in every case I had, but I don't think it's true that jurors just walk in and go, well, I'm just going to rule for who I think is the nicer person. That isn't what they do at all. No, I agree with that. I don't think that they all do that. But I do think that when you ask a juror, specifically in the jury charge in this case, it asks the juror to find a knowing intent on the part of the defendants to do this, and there's no evidence of that. And the Matura case is a summary. Well, the problem with knowing intent, I don't know what's in your mind right now. Maybe you think I'm an idiot. Maybe you think I'm smart. I can't tell just by looking at your head. I have to go by things you say. I have to go by what you wrote. If you went and wrote something online about Judge Haynes is an idiot, then I would know that's what you thought. But I can't tell just by looking at you what your thoughts are. And so when you're looking at knowing intent, that is something they have to look at, the facts that are presented. They can look because if I go, how are you doing? How are you doing? This is going to come out the same way in a transcript but be perceived differently by the jury. So they can look at what people say and how they say it. But they still don't know what's in the head. They can only look at all of the facts and the evidence. And why isn't that what jurors do? Because you have to look at it from the perspective of a reasonable juror also looking at this case. And if you look at that from the perspective, the Machar case actually tells us to also look at the reasonableness of the plaintiff. Was her reliance on anything the defendant said reasonable? So there are a couple of issues here. First, we don't have any threats from the defendant, no threats of deportation related to forced labor, nothing that actually directly causally linked a threat of serious harm or abuse of law or legal process to the actual plaintiff in this case. But aside from that, we have to look at the... Yes, Your Honor. The plaintiff testified to issues, but she also continued to work there up until the day she got caught stealing on August 20, 2018. So she worked there for a period of... Well, that jury didn't find her... I mean, that criminal trial did not find her guilty. Yes, Your Honor. I'm not privy to the criminal case, or it's also a higher burden of proof in the criminal case. Sure, but... But she was caught on camera. What we do know is that there's a picture in our brief of her finding the camera under the cash register, and she never appeared for work again after that day. The Oteros had caught her a second time stealing. They caught her originally in 2013, did call the police, but opted not to press charges at that point in time. So in 2018, when she was caught for a second time, they did press charges this time, and they never heard from her again until she filed this lawsuit against them. So there's ample... She said she wasn't stealing. Yes, she did say she was not stealing, but she also voluntarily quit her job. So she was not in a condition of forced labor if she voluntarily quit in 2018. So if you look at the perspective, which the Mutrara Court did, they looked at the perspective of the plaintiff. Did she have a reasonable belief that she was confined into this situation? And in this case, the plaintiff had access to the world at large. She had the freedom to marry. She had the freedom to travel. She did take trips with her own family, the Oteros. She did go places. She was encouraged from 2012 on. Doesn't she say that she was in the position of being a nanny so that when she went on trips, it was for working? Yes, Your Honor, but there's evidence in the record. First of all, if she wants to complain about her labor conditions, again, that's a different claim than a human trafficking claim. But there is evidence in the record that she's dressed up for Halloween in a Halloween costume and she's doing all kinds of activities that show that she's a part of the family. This is a family business. And attacking a small business who brought their own family members here is different than the purpose of the statute, which is to protect victims who have been trafficked here for nefarious purposes who really are in bad conditions. And if we extend the statute to a case like this, which is more properly brought under the Fair Labor Standards Act, we risk going down this rabbit hole of broadening a statute well beyond its statutory intent. I just have a question in my mind as to whether she'd have made the same amount of money out of a Fair Labor Standards case anyway. I guess nobody tried to calculate that. I'm not sure. I apologize. I can't answer that as to damages. Regardless of whether the plaintiff... We assume all of the facts that the plaintiff testified to as true, there is absolutely no causal link between any of the alleged threats or actions made by the defendants in this case that would indicate that the plaintiff was caused to be in a situation of forced labor. The plaintiffs cite the passport issues, but of course on cross-examination, if you look further down in the record, the plaintiff actually admits that Mr. Otero only withheld her passport for a one-week period. So in the minds of a reasonable juror, would they believe that a one-week passport, even assuming that it's true that he had her passport for one week during a period of four years that she's suing for, is that reasonable? And I would submit that it's not reasonable under the circumstances. You have limited time when you come back, so do you want to address the cross-appeal? Yes, sure, Your Honor. I can address that very briefly. We believe that the brief pretty well covers the merits regarding that. The district court judge said it pretty clearly that the issues that she experienced were, in detail on the record, that they were frustrating, overwhelming, and ultimately fraudulent, and it was well within the judge's discretion to award sanctions, and so we stand by our briefing on those issues. Okay, you've reserved time for rebuttal. Yes, I will give time back to the court. That's great. Thank you. Mr. Barrett. No. Mr. Yuan. Yes. This is Zen-Ou Hsien. May I please report? Are you . . . Okay. Are you on the cross-appeal only or on the whole case? I am taking about 10 minutes . . . Okay. . . . the main case, and Mr. Barrett will talk about the sanction part. Okay. May I read? Yes. Okay. So what's your answer to the notion that there was just simply no evidence for the jury to rely on and the jury just was screwed up? That's absolutely not true, Your Honor. I am prepared to show you all the trial transcripts, where about the threat, where about the long hours, where about taking your passport away and demand that if you don't work for three years, that I will report you to the immigration and that we'll be deporting you. And all this, there was about seven factors that I have put in my brief that shows about what happened. I have additional to show you from each individual witnesses, Mr. Barnes, his wife, Ms. Mao, who worked together with Sophie Treadway, the plaintiff, Sophie Treadway herself, and her husband, Rocky Treadway. All substantiate each other, saying that they were forced to work for three years for Ms. Mao and Sophie Treadway continued to be forced to work until June 2016 at $75 a month. Then why did she stay after she finally got a green card? Okay. That's a very good question, Your Honor. In fact, it was made clear during the trial that Otero was telling them that if you don't pay me back the $20,000, I would have to deport you. Now, that's not only that. They also took the passport away and saying that, well, you cannot just pay me back. If you don't work enough time, three years is what Otero told Mr. Barnes and Ms. Mao. If you don't work enough for three years, they understand in the testimony in the trial, it was two years, and then they add another year on top. The two-year part is so important that Mr. Barnes and Ms. Mao were now married, and Mr. Barnes have an antique shop in Long Beach, California, and he was unable to take his wife to go with him. But that's not our plaintiff. That's the other lady. Yes, but they are working together. So you can see that from looking at the totality of the evidence, you can see that Sophie Treadway had seen her aunt, who worked together with her, was put in that situation. So it is impossible if you just single that out, because she is working with her daily and knows that if Mr. Barnes could not take Mao to go out, her boyfriend, Rocky Treadway, who would later on become her husband, were not able to continue to be able to help her. So you can see that the $20,000 in the testimony, it shows that it would take her about 12 years without spending any money. If she were to deport back to Cambodia, that she would have to spend 12 years to make up that $20,000. That makes no sense to me. You mean if she was working for $75 a week? But I thought she was sending money back to Cambodia regularly. That's not true. That's what they would make her to admit that they were sending money. In fact, there are testimonies showing that Ms. Treadway and Ms. Mao both said that they only get $75 a month and do not have any money other than that. So if you look at the trial transcript, there are differences between the defendant and the plaintiff in their witnesses, but there is no clear error. Yes, that's the verdict. They have believed that the plaintiff had told the truth. And they award compensatory damages. And because of this outrageous conduct of the defendant, they also award punitive damages. This is not just a short time. You're talking about a person work from 1.30 a.m. to 4 p.m. and go home and still have to do massage and still have to take care of the cooking and cleaning of the house. This is not anticipated in their formal coming from Cambodia, having to sit in the passport as a domestic worker. They never anticipated that they open a donut shop and then have them work for about 14 hours at the donut shop. Well, they're not going to own a donut shop after this case is over, are they? I'm sorry? Your Honor? The defendants will have a hard time keeping their donut shop after this case is over. That's right. They closed it. They did. Great. They did close it. Your Honor, so when... How are they going to pay you off? Are they going to work for 12 years? In fact, that's a very good question, Your Honor. I haven't received a single dime so far. But I have seen there is human decency. I have to come and represent Sophie Treadway to work to get the court... Collecting the dollars is not our issue. Our issue is just whether they correctly got them. Yes. Awarded. I also would like to show the court that the serious harm is imminent in this case. Even though that the Supreme Court, the Fifth Circuit, also mentioned that serious harm is a measure, but by the fact that how you have in the situation that you have to face to provide that compulsory or forced labor, and that the serious harm was shown in the process of being threat, of use of threat, of taking the passport away, taking a copy of the passport. Did he take the passport for one week? They took one week, but they took picture of that, too. So that means that they could report to the immigration any time they wanted to. I thought they said they took the passport for one week in order to try to extend her visitor visa. No, no, it's not. It is the testimony which shows that they took the passport when Mr. Barnes wanted to take his wife to California and live with him. And at that time, they took the passport away from Ms. Mao. And also, Ms. Sophie Cherry also testified that they took the passport. Did not say how long, but they took her passport away and took a copy of that. So it's not about extending the visa. At that point, it's long past that time that they could extend the visa. So when they said there is no evidence at all or insufficient evidence, the court and the rule of civil procedure was clearly on that, showing 52.86. It said that the court appeal will look at whether or not there is a clear error, not on a de novo basis. I don't know how much time I spent. You have one minute and a half. Oh, OK. All right. And same thing on this one-bacon insurance versus T-way. It's Fifth Circuit in 2016. The case shows that when there is a jury verdict or a direct verdict or on this de novo or on the appeal, that the court would have the right to look in . . . to have the way to look at it in favor of the non-moving party or all the record, not just part of the record. How do you distinguish the Muchaira case from the Fourth Circuit? One more time, Your Honor. How do you distinguish the Muchaira case from the Fourth Circuit, where the lady from Kenya was working for a Saudi couple? The summary judgment was affirmed for the defendants. Well, summary judgments have a different duty than a jury verdict. Because the finding of fact, the court would defer to have a deference to the jury verdict of finding of fact. On the summary judgment, the fact is not what was being questioned. Well, actually, the bulk of that opinion talks about the idea that the Traffic Victim Protection Act is different, as she says, from the Labor Standards Act. There was not evidence that the couple there were knowingly forcing her to labor and that they didn't pay her much money, but they facilitated her means of communication, let her have some freedom, very similar on the facts of this case. Yes, Your Honor, I don't remember seeing detail about that particular case, but I do want to show that the 18 U.S.C. 1589C had a very clear definition of serious harm and abuse or threatening use of law and legal process. Does that mean if she were an American citizen, all she'd have is a fair labor standards claim? If she had American citizen, I don't know the answer to that. Well, of course, the answer to that is, I think, well, maybe I'm wrong. Well, she could have been thrown out of the country. That is the part of fear that she had to go through. The fact that after she was thrown out of the country, she had to pay the $20,000 back, which she was testified making about $150,000 a month. Was there any evidence of a ledger or how much she had paid back to the Oteros? Did she pay back a dime? She had to work to pay back. And she did work all this time when that $20,000 was only a fictitious number, because during the trial, we have found that we repeatedly asked a visa application for a visitor is only about $50, $60. How do you come up with $20,000? Where are the receipts? There was no receipts. Well, if you have to pay an immigration lawyer, it costs some money. Your Honor, there was no immigration lawyer involved about visa at the consulate, in the embassy, or in Cambodia. Okay, your time is up. Thank you, Your Honor. Mr. Barrett. May it please the Court, good morning, Your Honor. My name is Kenneth Barrett and I represent the cross-appellants in this matter on the issues pertaining to the sanctions that were entered in this case. The trial court erred when it entered more than $53,000 in sanctions against counsel and the party for effectively, zealously representing his client, at times using controversial theories and unsettled legal principles, and also in reliance of state statutes and some federal precedent. Specifically, the trial court erred when it awarded sanctions against Mr. Yin under Section 1927, which has a very high standard, as the Court is aware, for having filed an abstract of judgment after the entry of judgment in this case. The trial court mistakenly labeled the filing of the abstract of judgment as an instrument of extreme collection, when under the Texas statutes, an abstract of judgment can be filed as soon as a judgment is entered. Mr. Yin filed an abstract of judgment in this case under Section 52.002 of the Texas Property Code Subsection B. An attorney can prepare an abstract of judgment and have it filed. The district court disagreed with that and labeled that extreme collection activity and sanctioned Mr. Yin for having done so. Now, the Federal Rule 62 and 69 require the federal district courts to use or rely upon the state rules of procedure in the state statutes. Those statutes permit Mr. Yin and other counsel in situations where they obtain a judgment to go ahead and file an abstract of judgment. There's also federal precedent that indicates that filing an abstract of judgment is only giving the world notice that you have a judgment lien. It is not an instrument of actually collecting the judgment according to some courts. Whatever order the judge issued, did she issue orders saying that there were to be no collection efforts? Yes. There was an order issued that said there were to be no collection efforts. The issue becomes whether the abstract of judgment was an instrument of collection. The court's order did not state abstracts of judgment. It seemed to be more related to what had taken place before the filing of the abstract of judgment and what had taken place before the entry of the judgment. For instance, an actual dispendence would have violated the court's order.  An abstract of judgment is not considered by some courts a collection means. It's just giving notice to the world. What's your best case on that? On the . . . An abstract of judgment is not a collection effort. The brief refers to a couple of cases in . . . Just a second. Well, you don't need to take all your time. You can send us a 28-J letter highlighting those cases. The second issue pertains to the filing of what was labeled a notice of lien before the entry of judgment in the case. The trial verdict was rendered on April 11th. I'm sorry, the jury's verdict. On June 17th, the court actually entered judgment. Between those two periods of time, the plaintiff became aware, in direct conversations with Mr. Otero, that they had assets and that they were going to make sure that no recovery was ever obtained.  The counsel for Ms. Treadway then petitioned the court to go ahead and enter judgment based on the April 11th verdict. As I said earlier, that did not occur until June 17th. In an act of desperation, counsel for Treadway filed a document entitled Notice of Lien, which in the first paragraph talks about the human trafficking action. Now, I've got to use an analogy here. There's a lake here called Pontchartrain. If I label it an ocean or the Gulf of Mexico, it does not make it anything other than a lake. This particular document that the judge entered sanctions on does not use the word lispendence. In its first paragraph, it disqualifies itself as a lispendence because it says that there was a verdict in a human trafficking case. The court took the other side's description of the document and ran with it and labeled it a lispendence when on its face it could not be interpreted to be a lispendence. Now, counsel for Treadway admittedly made a mistake by adding in language referring to a California statute, but he just referenced that language and he did not call it a lispendence. And that statute does happen to mention claims involving title of real estate, but nowhere in the document or nowhere in the attachments does the Treadway allege that the title to property was at issue. So the document does not qualify as a lispendence. It qualifies as a rushed action, desperate action by counsel trying to protect his clients and give notice to the world that a judgment may be imminent. And we contend that under the heightened standards under Section 1927, which require bad faith, recklessness, and all sorts of negative motivations, that that act of filing that notice of claim was frivolous. It was probably legally wrong, but it was not worthy of imposition of sanctions. Finally, the final issue pertains to what happened during the course of the case. The court entered sanctions as a result of counsel having filed a motion to compel the production of financial records of Mr. Otero. The other side had objected to those discovery requests saying that they were too broad and that they covered a nine-year period. Well, that nine-year period substantially mirrors the period of time that Ms. Treadway was laboring for these plaintiffs. She began working for them in the U.S. in 2012 and left in 2018. The time requested for the documents is 2010 to 2018, so it mirrors that closely. Why is that important? Because the statutes at issue here, which is the TVPA, talks about damages. It gives the plaintiffs a right to obtain punitive damages. When punitive damages are at issue, the financial condition of the defendants are at issue. Would they be able to play a punitive damages verdict? How did they financially benefit? How did they profit from the forced labor? That's at issue, and therefore the documents requesting bank statements, loan documents, credit lines, those types of things, are relevant to determining whether or not what the financial condition of an individual is. They are also relevant because Mr. Otero put at issue the fact that he says he was providing clothing, rooming, room, and board as partial compensation in addition to the $75 a month. The records requested were geared in part to discover that information and find out whether that was true and what the value of that was. It was all relevant to that issue. Finally, under the statute, a defendant, not just the defendant who employs a person, could be liable, but also anybody who financially benefits in any way, either directly or indirectly, can be liable under the statute. As Mr. Otero was a defendant and it was alleged that he financially benefited, we were entitled to access his financial records. Under Rule 37 of the Federal Rules of Civil Procedure, the issue is whether the motion to compel should be granted, and if it's not granted, whether fees should be imposed. The standard is that it was a motion substantially justified. The definition, according to Pierce v. Underwood in the Supreme Court, is that there's substantial justification if a reasonable person could have agreed with the motion to compel. Given the nature of the statute and the scope of the records and the time period involved, the motion to compel was substantially justified. We request that the Court reverse all of the sanction awards in favor of the cross-evaluates. Thank you. All right. Thank you. Okay, Ms. Boletta. May it please the Court. Your Honor, I would first like to address the passport issue. If you look at page 7237 of the record, the plaintiff admits that her passport was only taken for one week. And there's absolutely no allegation that the plaintiff ever makes during the entire course of the record that the keeping of the passport for a one-week period was tied to deportation. In fact, the only mention of deportation in the entire record is an alleged threat, which I understand we will assume for purposes of argument that it is true, that Mr. Otero threatened to deport her if she got pregnant by Mr. Treadway because he did not want to take care of the baby or have another baby, a mouth to feed in his household, so to speak. There is no threat that the deportation was directly linked to any type of forced labor or a condition of peonage. Mrs. Barnes' testimony, as Your Honor pointed out, is no evidence as to the plaintiff. So although she mentioned deportation or a fear of deportation at one time, that does not pertain to the plaintiff, who in this case did not testify the same. Further, there is no evidence as to when these passports were taken. So the appellees stated that the passport was taken before she went to California. I do not believe that is in the record. There is just a statement that the passport was taken for a one-week period, and there's no specifics as to when that was taken at any point in the record. Mrs. Otero, the defendant in this case, did say that she took the passport to make a copy for the purpose of trying to get them here legally, extending their visas, but she never—there's nothing in the record indicating that she took a copy. Neither the plaintiff nor the aunt testified that the copy was for the purpose of threatening them with deportation if they did not remain in this alleged forced labor state. There's absolutely not a single piece of evidence that complies with the statute, a threat of harm, serious harm, abusive law, abusive process. Even assuming that withholding a marriage is true, that's not a threat of abusive law or legal process that would fit the forced labor statute, and therefore all of the plaintiff's claims should fail in that regard. As Your Honor pointed out, the plaintiff did send money periodically, she admits, to Cambodia. Monthly, she sent amounts anywhere from $100 to $500, which again— How is that proven up? The plaintiff's testimony. The plaintiff admits that she sent money to—back that Mrs. Otero escorted her. I believe that Mrs. Otero specifically said she escorted her to Western Union for the purpose of helping her complete the transactions, but she does admit that on several occasions she sent money back to Cambodia to help her family, which, as Your Honor pointed out, that would be quite difficult on a $75 a month salary. Again, all of the appellee's claims pertain to working conditions and labor conditions, and not for the purpose that the human trafficking statute is supposed to address, to address people who are in really deplorable conditions. As the Muchara case clearly lays out, the purpose of the human trafficking statute is to protect those types of people. It is for these reasons we ask that you reverse and render a take-nothing for the plaintiff and affirm the sanctions decision. All right. Thank you very much. We are in recess until tomorrow morning at 9 a.m.